Shawn A. McMillan, Esq. (Cal. Bar # 208529)
attyshawn@netscape.net
Stephen D. Daner, Esq. (Cal. Bar # 259689)
steve.mcmillanlaw@gmail.com
Adrian M. Paris, Esq. (Cal Bar # 301355)
adrian.mcmillanlaw@gmail.com
THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
4955 Via Lapiz
San Diego, California 92122
Phone: (858) 646-0069
Fax: (858) 746-5283

Attorneys for Plaintiffs, Totiyanna Turner and Freddie Madrigal

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| TOTIYANNA TURNER, an individual; FREDDIE MADRIGAL, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTINA BUTCHER, an individual; BRENDA LEMLEY-SPENCE, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No:<br><br>**COMPLAINT FOR DAMAGES**<br><br>Claim 1 – Unwarranted Seizure<br><br>Claim 2 – Deception in The Presentation of Evidence<br><br>Claim 3 – Unwarranted Medical Examination<br><br>Claim 4 – Unwarranted Vaccinations<br><br>[**JURY TRIAL DEMANDED**] |

**Jurisdiction and Venue**

1. Plaintiffs Totiyanna Turner and Freddie Madrigal bring this lawsuit pursuant to 42 U.S.C. §1983 to redress the deprivation of rights secured to them under the United States Constitution, including the First and Fourteenth Amendments. These deprivations were inflicted by the Defendants herein, and each of them, in some manner.

2. Jurisdiction is conferred pursuant to 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States.

3. Because the acts and omissions complained of herein occurred in Arizona, and it is believed that all Defendants currently reside in the State of Arizona, venue is proper in the District Court for the District of Arizona.

4. These allegations are based on Plaintiffs' personal knowledge, investigation by their counsel, and on information and belief.

**Parties**

5. At all relevant times, Plaintiffs, Totiyanna Turner ("Totiyanna") and Freddie Madrigal ("Freddie"), resided in Maricopa County, Arizona, maintaining a family with their son, K.M.[1] Collectively, Totiyanna and Freddie will be referred to as "Plaintiffs" herein. Plaintiffs are individuals and citizens of the United States who presently reside in California.

6. Plaintiffs are informed and believe and thereon allege that the Arizona Department of Child Safety ("DCS") is a subdivision, entity, or administrative arm of the State of Arizona.

7. At all times relevant herein, Defendant Christina Butcher ("Butcher") is and was an individual employed by the State of Arizona through DCS as a social worker.

/ / /

[1] The child's full name has been replaced with initials to protect his privacy rights.

8. At all times relevant herein, Defendant Brenda Lemley-Spence ("Lemley-Spence") is and was an individual employed by the State of Arizona through DCS as a supervising social worker.

9. Defendants DOES 1 through 50 are sued as fictitious names, their true names and capacities being unknown to Plaintiffs. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities. Each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this Complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names. Plaintiffs make all allegations contained in this Complaint against all Defendants, including DOES 1 through 50.

10. Whenever this Complaint references any act of the Defendants, and each of them whether jointly or severally, such allegations shall be deemed to mean all named Defendants and DOES 1 through 50, and each of them, and/or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who performed or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

11. At all times herein mentioned and with respect to the specific matters alleged in this Complaint, each Defendant (including DOES 1 through 50), was a partner, agent, employee, employer, and/or principal, of each of the remaining Defendants, and was at all times acting within the course and scope of such capacity, and each defendant has ratified, approved, conspired in, and/or authorized the acts of each of the remaining Defendants and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

12. At all times mentioned herein, each of the above identified defendants, including DOES 1 through 50, was an officer and/or agent of the State of Arizona, and

was acting under color of law within the course and scope of their respective duties in doing the things and acts herein alleged.

## GENERAL ALLEGATIONS

13. As of June 23, 2017, Totiyanna Turner, Freddie Madrigal, and K.M. constituted a family unit, entitled to Constitutional protections arising under the First and Fourteenth Amendments. This includes, but is not limited to, the right to live together free of unwarranted governmental interference, the right to familial privacy, and the right of parents to reasonably direct the upbringing, care, and control of their children without unwarranted governmental interference.

14. During a previous relationship, Totiyanna had another child named D.P. [2] When D.P. was born in 2014, Totiyanna and D.P. lived in Los Angeles County.

– ***Los Angeles Social Workers Intrude Into Totiyanna's Relationship With D.P.***

15. Two days after D.P.'s birth in 2014, the Los Angeles County Department of Children and Family Services seized D.P. from Totiyanna's custody. At the time D.P. was seized, he was perfectly healthy and uninjured.

16. Miguel Pelayo, D.P.'s biological father, was not available to care for D.P. Totiyanna participated in reunification services with D.P. through the Los Angeles social workers.

17. The Los Angeles Juvenile Court ("California Court") oversaw D.P.'s dependency proceeding and Totiyanna's progress through reunification services.

– ***Totiyanna and Freddie Enter Into a Familial Relationship***

18. In September 2015, Totiyanna started a relationship with Freddie Madrigal who lived in Los Angeles, California.

19. Their relationship blossomed. Totiyanna moved in with Freddie in December 2015.

/ / /

[2] The name of the child has been replaced with initials to protect his privacy rights.

20. Freddie was not a party to D.P.'s dependency proceeding. No allegations of neglect or abuse were ever leveled against him. Freddie was not involved in D.P.'s dependency proceeding – in any way.

– *In September 2016, Totiyanna and Freddie Start A Family*

21. In September of 2016, Totiyanna and Freddie were blessed with the news that Totiyanna was pregnant with K.M. Totiyanna told the California Court judge and the Los Angeles County social workers the good news. At no point did the California Court or the Los Angeles County social workers express any concerns about the pregnancy.

22. Totiyanna attended multiple hearings. And, Totiyanna continued to complete the tasks assigned to her by the California Court and Los Angeles County social workers, and continued to actively participate in reunification services. The California Court continued to liberalize visitations between Totiyanna and D.P.

– *In February of 2017, Freddie Gets a Job In Arizona and The Family Moves*

23. In 2016, Freddie and Totiyanna started to consider moving to Arizona, because they thought they could provide a better life for their children due to the lower cost of living. In November of 2016, Freddie started traveling between Arizona and California to find a good paying job and a good home for their new child.

24. Totiyanna repeatedly informed the California Court and Los Angeles County social workers of her impending to move to Arizona. During that time, the California Court saw Totiyanna numerous times while she was pregnant.

25. Freddie found a job in Arizona in February of 2017. Freddie headed out to Arizona in advance of Totiyanna to find a home for them. Totiyanna planned to move out to Arizona to reunite with Freddie once he had settled.

26. Totiyanna followed Freddie to Arizona a couple of weeks after he moved. The California Court and Los Angeles social workers knew of Totiyanna's intention to move for months.

/ / /

27. Totiyanna and Freddie had a loving and stable relationship. Freddie had a good job, and had established a stable home. The family flourished.

28. K.M. was born in Arizona on April 6, 2017. He lived with his parents, who provided him with a safe and stable home environment.

– ***On June 21, 2017, The California Court Orders a Home Evaluation in Relation to Totiyanna's Reunification With D.P.***

29. Totiyanna actively participated in reunification services with D.P., even after K.M. was born, and was successfully progressing toward full reunification. Starting in late February 2017, Totiyanna had court-approved unmonitored visits with D.P. Totiyanna regularly commuted between Arizona and California.

30. Starting in April 2017, the California Court also allowed Totiyanna unmonitored overnight visits with D.P. in Arizona. Between April 2017 and June 2017, there were several of these visits.

31. On June 21, 2017, the California Court held a status hearing to evaluate Totiyanna's progress. Totiyanna and Freddie brought K.M. to the hearing. The California Court saw K.M., but did not order him removed from Totiyanna's custody. The California Court voiced no concerns about K.M.'s safety, instead allowing Totiyanna to leave with K.M.

32. The California Court and Los Angeles social workers knew that Totiyanna successfully relocated to Arizona. As a result, the California Court ordered Los Angeles social workers to conduct a home assessment of Totiyanna's home in Arizona to determine whether D.P. could be safely placed with Totiyanna.

33. After the June 21, 2017 hearing, Totiyanna and Freddie drove back to Arizona. H.M., Freddie's 15-year old daughter from a prior relationship, accompanied them. H.M. had been living with Totiyanna and Freddie throughout her summer break.

34. Totiyanna, Freddie, H.M., and K.M. did not arrive home until some time after 3 a.m. the next morning. Exhausted from their long journey, they fell asleep.

/ / /

– *Defendants Butcher and Lemley-Spence Start Their "Home Assessment" On June 22, 2017*

35. Defendant Christina Butcher was assigned to evaluate Totiyanna's home. Defendant Lemley-Spence was assigned as the supervising social worker. Arizona DCS labeled this situation as non-emergency, meaning that the investigators had 48 hours to respond. There was no immediate danger to K.M. noted.

36. On June 22, 2017, in the early morning, Butcher knocked on Totiyanna and Freddie's door. Freddie answered the door and allowed Butcher to enter and inspect the home. Totiyanna and Freddie assumed Butcher was at their home for the courtesy home assessment ordered by the California Court at the hearing the day before.

37. Totiyanna and Freddie cooperated with Butcher and answered all of her questions honestly, including questions related to D.P.'s dependency proceedings in California.

38. Totiyanna gave Butcher contact information for her assigned Los Angeles social workers.

39. Freddie explained to Butcher that he had no dependency history in either California or Arizona. Freddie also told Butcher that D.P.'s dependency case had nothing to do with him or K.M., and that no allegations of any kind had ever been leveled against him.

40. Freddie disclosed to Butcher that in February 2016 he began looking to Arizona for better paying work and a lower cost of living – well before Totiyanna had even become pregnant with K.M.

41. Totiyanna told Butcher that the California Court ordered a home assessment and that she believed that was the purpose of Butcher's visit. Totiyanna also told Butcher that the assessment of the home was ordered by the California Court to help her reunify with D.P.

/ / /

/ / /

– ***Defendant Butcher Leaves K.M. With Totiyanna and Freddie on June 22, 2017***

42. During Butcher's home visit, she rummaged through Totiyanna and Freddie's kitchen, pantry, and refrigerator. Butcher noted that Totiyanna and Freddie had plenty of formula and provisions for K.M.

43. Butcher observed and reported that K.M. was well taken care of, had no injuries, and no other signs of maltreatment or neglect. Butcher left without seizing K.M. There was never any allegation that the baby, K.M., was in immediate danger of suffering severe bodily injury at the hands of either parent – or any danger at all, for that matter.

44. By the end of her visit, Butcher had inspected Plaintiffs' home and observed no issues that posed any threat or danger to K.M.

45. Butcher concluded that there was no indication of present danger to K.M. Butcher concluded and reported there was no condition likely to result in severe harm to the child. Butcher also concluded and reported that day that no protective action of any kind was required. Butcher left K.M. with Totiyanna and Freddie. At no point was there any articulable evidence to even suggest that K.M. was in danger of any harm from anyone, immediate or otherwise.

– ***Butcher Schedules a Meeting For the Next Day at the DCS Office***

46. As Butcher left, she handed Totiyanna and Freddie a notice, scheduling a Team Decision-Making Meeting (TDM) for the next day, June 23, 2017 at DCS's office in Phoenix. Butcher explained that the TDM was simply to let Totiyanna and Freddie know what resources and services might be available to them, if needed.

– ***On June 23, 2017, Totiyanna, Freddie, H.M., and K.M. Attend the TDM***

47. On information and belief, neither Butcher or Lemley-Spence conducted any further assessment or investigation. Regardless, nothing had changed between June 22, when Defendants left K.M. with his parents, and June 23, the date of the TDM.

48. At 11:00 a.m. on June 23, 2017, Totiyanna, Freddie, H.M., and K.M. arrived at the DCS building in Phoenix for TDM.

49. Before the TDM started, Butcher told H.M. to accompany her to an isolated room.

– ***Butcher Interrogates H.M.***

50. Butcher interrogated H.M. Butcher asked H.M. questions about sex and her sexual activity.

51. H.M. denied any wrongdoing by either Freddie or Totiyanna. H.M. confirmed there was no abuse, neglect, domestic violence, illegal substance use, or any other issues in the home.

52. H.M. also confirmed that both Freddie and Totiyanna were taking good care of K.M. She stated that all the interactions she saw between Totiyanna and K.M. were loving and nurturing and that all of K.M.'s needs were met.

53. At 11:30, H.M. and K.M. were escorted to a separate "play" room on the opposite side of the building from the TDM. This room was closed off and the exit was guarded by Lemley-Spence.

54. H.M. held and watched K.M. while Totiyanna and Freddie attended the TDM. Lemley-Spence ensured that H.M. and K.M. were unable to leave.

– ***Defendants Butcher and Lemley-Spence Seize K.M. Without a Warrant or Lawful Justification During the TDM***

55. The TDM facilitator asked questions in an attempt to resolve any issues without resorting to removing K.M. The facilitator provided tips for the family and the conversation maintained a positive tone throughout. Meanwhile, Butcher grew more impatient, her leg shaking in anticipation.

56. When Butcher's patience ran out, without discussion or warning, she threw a completed Temporary Custody Notice down on the table and abruptly told Totiyanna and Freddie that DCS was seizing K.M. then and there.

57. Butcher left the meeting room. When she returned, she was accompanied by H.M., who was in tears. K.M. was nowhere to be seen. H.M. told Freddie that Lemley-Spence had reached out and abruptly snatched K.M. in the back room.

58. Freddie was furious that K.M. had been seized. He escorted the sobbing H.M. out of the building.

59. At the same time, Totiyanna pleaded with Butcher not to take K.M. Realizing her pleas fell on deaf ears, Totiyanna begged Butcher to accept diapers and milk, and other sundry baby supplies for K.M. Despite her pleas, Totiyanna left the building that day without her baby. Totiyanna was not allowed to say goodbye to K.M. or see K.M.

60. Butcher told Totiyanna that it was the standard procedure for K.M. to be removed and that they simply had to go through the process. Butcher also told Totiyanna that K.M. would be returned eventually.

61. By 1:15 p.m. on June 23, 2017, Butcher and Lemley-Spence had seized K.M. from Totiyanna and Freddie's rightful custody without any lawful justification, and without first obtaining a warrant or court order authorizing K.M.'s detention.

62. At the time K.M. was seized, he was happy, healthy, and well cared for. There was no immediate or apparent threat to K.M.'s health, safety, or welfare. At the time he was seized, Butcher and Lemley-Spence had not sought to obtain a warrant prior to the seizure, nor had they obtained parental consent – in fact, both parents strenuously objected to K.M.'s unwarranted seizure.

63. Butcher and Lemley-Spence seized K.M. from *both* Totiyanna and Freddie, based solely on the fact that D.P. was the subject of a dependency action in Los Angeles County involving Totiyanna.

64. At the time of K.M.'s unwarranted seizure, other more reasonable and less intrusive alternative means existed to ensure his safety, assuming he was ever actually at risk. For example, Freddie was in Arizona and available to care for K.M. At the time of seizure, both Freddie and Totiyanna were also willing and able to make arrangements for K.M.'s care, such as leaving him in the care of other relatives. At no point did Butcher or Lemley-Spence even consider lesser intrusive alternative means of ensuring K.M.'s safety from a specific danger.

– ***On June 27, 2017, Defendants Subject K.M. to an Intrusive and Unwarranted Forensic Medical Examination***

65. On June 27, 2017, at Butcher and Lemley-Spence's direction, K.M. was subjected to a forensic medical examination by Defendant Doe 1. No Defendant sought or obtained a warrant or other court order authorizing K.M.'s forensic medical examination.

66. Butcher, Lemley-Spence, and Doe 1 never notified Totiyanna and Freddie where or when the examination would be done. In fact, Totiyanna and Freddie were never notified at all. They did not learn K.M. was medically examined until over a year later. They did not consent to K.M. being medically examined at any point.

67. At the forensic medical exam, K.M. was found to be healthy, exhibited no signs of abuse, showed no signs of any type of injury, had no medical problems, and was not in need of any medical attention. There were no allegations that Totiyanna and/or Freddie had ever caused any harm to K.M. whatsoever.

68. The forensic medical examination included an intrusive and traumatizing genital examination, even though there were never any allegations, evidence, or even suspicions, of sexual abuse.

69. Nonetheless, without any reasonable basis to conduct a forensic medical examination on K.M., Defendants ordered a complete forensic medical examination of K.M. At the time K.M. was examined, both Freddie and Totiyanna were in Arizona and available to accompany K.M. Moreover, there was plenty of time to obtain a court order permitting the forensic examination assuming such an exam was even necessary.

70. At the time of this forensic medical examination, the preliminary hearing had not yet taken place and the Arizona Juvenile Court ("Arizona Court") had not been afforded any opportunity to even consider evidence or argument relevant to K.M.'s removal and/or detention.

/ / /

/ / /

– ***On June 27, 2017, K.M. is Subjected to Multiple Invasive Medical Procedures Including Unwarranted and Non-Consensual Vaccinations***

71. On June 27, 2017, while K.M. was in the State's custody, Butcher and Lemley-Spence also directed that K.M. be administered six separate vaccinations by Defendant Doe 2. No parent or relative was informed that these vaccinations would occur, and no court order permitting vaccinations was obtained. Totiyanna and Freddie did not consent to these medical procedures.

72. Defendants never notified either Totiyanna or Freddie prior to the procedures where or when the procedures would be performed. Nor did Defendants seek or obtain either parents' consent to said procedures.

73. At this time, K.M. was healthy, had no medical problems, and was not in need of any medical attention.

74. Nonetheless, Doe 2 performed several sets of vaccinations on K.M. without any reasonable basis to do so. At the time K.M. was vaccinated, both Freddie and Totiyanna were in Arizona and available to accompany K.M.

75. At the time of these medical procedures, the preliminary hearing, or any other court hearing, had not taken place, and the Arizona Court had not considered any evidence or argument relevant to either K.M.'s removal and/or detention.

– ***The Arizona Court Dismisses the Dependency Petition and Returns K.M. to Plaintiffs' Care***

76. On July 3, 2017, the Arizona Court held K.M.'s initial dependency detention hearing. The Court assessed the need, if any, for K.M. to be detained from his parents' care and custody. Testimony and evidence was provided by DCS and its social workers.

77. During the hearing, Butcher admitted that she had no evidence to suggest that Totiyanna could not care for K.M. Butcher was unable to articulate any safety concerns and could not provide any evidence that Totiyanna had acted inappropriately toward K.M. at any point in time – ever.

78. In spite of this, DCS prolonged Plaintiffs' suffering by requesting additional time to present "evidence." The Arizona Court continued the hearing to July 6, 2017. Nonetheless, Defendants were still unable to produce any evidence that K.M. was unsafe in his parents' care.

79. On July 6, 2017, the Arizona Court considered all of the Defendants' evidence, found there was no basis to remove K.M. The Arizona Court also confirmed that Freddie was able and willing to protect K.M. from harm. This fact was known or reasonably should have been known by Defendants prior to K.M.'s unwarranted seizure.

80. At the conclusion of the hearing, the Arizona Court dismissed the Dependency Petition and immediately released K.M. back to his parents' custody.

81. Defendants Butcher and Lemley-Spence had failed to show, in any way, that K.M. had been abused or neglected. K.M. was thus improperly and unlawfully detained from Totiyanna and Freddie's custody for over two weeks. During that time, Totiyanna, Freddie, and K.M. were denied their fundamental right to live together as a family and suffered massive and enduring emotional trauma.

## FIRST CLAIM – Violation of Civil Rights (42 U.S.C. §1983)

**(Procedural Due Process, Unlawful Seizure, Invasion of Privacy, and Interruption of Familial Association)**

**By PLAINTIFFS TOTIYANNA TURNER AND FREDDIE MADRIGAL**

**Against Defendants BUTCHER, LEMLEY-SPENCE, and DOES 1 through 50, inclusive**

82. Plaintiffs Totiyanna Turner and Freddie Madrigal incorporate the above allegations as though fully set forth herein.

83. Defendants, and each of them, at all relevant times herein were acting under color of law when they jointly acted, or knew and agreed and thereby conspired, to violate Plaintiffs' constitutional rights by, but not limited to, removing, detaining, and continuing to detain K.M. from the care, custody, and control of his parents, without proper or just cause and/or authority, in the absence of any exigency, and without first

obtaining a warrant or other court order.

84. At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the United States Constitution was so "clearly established" that any reasonable government agent in Defendants' situation would know it is unlawful to seize a child from the care, custody, and control of its parents in the absence of exigent circumstances without first obtaining a warrant to do so. Furthermore, any reasonable government official would know that to do so would constitute a violation of the parents' well-elaborated constitutional right to live together without undue governmental interference.

85. None of the Defendants sought, or obtained any type of warrant or court order, prior to seizing K.M. Defendants, and each of them, jointly acted or conspired to seize the child, as described above, knowing that no warrant authorizing the child's seizure issued and that exigent circumstances did not exist. They also knew that neither parent consented to K.M.'s unwarranted seizure.

86. When K.M. was seized, he was receiving appropriate care – and lived in a safe environment – as Lemley-Spence admitted in her investigation notes.

87. There was no evidence or even allegations that Totiyanna had physically abused or harmed K.M. in any way. There was no evidence or allegations that Freddie had physically abused or harmed K.M. in any way. There was no evidence that K.M. was in immediate danger of suffering serious bodily injury at the hands of either parent.

88. At no time *ever* did any of the Defendants have any specific, articulable evidence to support any reasonable basis to believe that K.M. was in immediate danger of sustaining serious bodily injury or death at the hands of either Plaintiff. Indeed, the conduct of these Defendants, and each of them, was in knowing and/or reckless violation of Plaintiffs' clearly established rights.

89. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety, emotional distress,

pain and anguish, among other things.

90. At no point did Butcher or Lemley-Spence even bother to seek a warrant prior to seizing K.M. from his parents. Instead, Defendants Butcher and Lemley-Spence, and each of them, intentionally, or with a reckless or malicious disregard for Plaintiffs' known rights, seized K.M. from his parents' care. At the time of the seizure, there was no specific or articulable evidence to show that K.M. was in any danger at the hands of either parent. Moreover, even if such a danger had existed, there were ample lesser intrusive alternative means of protecting the child – and Defendants knew it. Due to Defendants' knowing violation of Plaintiffs' rights, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of them, subject to proof at trial.

**SECOND CLAIM FOR RELIEF – §1983**

***(Deception in The Presentation of Evidence to the Juvenile Court)***

**By PLAINTIFFS TOTIYANNA TURNER AND FREDDIE MADRIGAL**

**Against Defendants BUTCHER, LEMLEY-SPENCE, and DOES 1 through 50, inclusive**

91. Plaintiffs Totiyanna Turner and Freddie Madrigal incorporate the above allegations of fact and law as though fully set forth herein.

92. The right to be free from judicial deception in juvenile dependency proceedings was clearly established prior to 2017, such that any reasonable government official in Defendants' situation would know that it was unlawful to lie, fabricate evidence, or suppress material exculpatory evidence in juvenile court proceedings.

93. After Defendants seized K.M. they were required to draft a report, which accompanies a petition filed with the Arizona Court. The Arizona Court relies on this evidence and report to determine – at the outset – whether K.M.'s seizure and continued detention was necessary. This initial dependency hearing is the first hearing in a juvenile dependency action – it is akin to an arraignment in criminal proceedings.

/ / /

94. On June 26, 2017, Defendants Butcher and Lemley-Spence signed K.M.'s Report to the Arizona Court for Preliminary Protective Hearing And/Or Initial Dependency Hearing ("Dependency Report"). Defendants' Dependency Report is an official document. Defendants prepared it and filed it with the Arizona Court to initiate K.M.'s dependency proceedings. By law, the Dependency Report is required to be verified and must not contain false and/or untrue statements or information. The matter set out in the Dependency Report is required to be honest, accurate, and complete in all material respects. In addition, to the extent exculpatory information exists, it is required to be disclosed to the Arizona Court on the face of the report.

95. Defendants also included knowingly false statements in their June 27, 2017, Juvenile Dependency Petition ("Petition"). Butcher verified this petition under penalty of perjury. By law, the Petition is required to be verified under penalty of perjury. The matter set out in the Petition is required to be honest, accurate, and complete in all material respects. In addition, to the extent exculpatory information exists, it is required to be disclosed to the Arizona Court on the face of the petition.

96. On June 27, 2017, Butcher signed the Petition under penalty of perjury, and attested to the veracity of all information contained therein. After signing the petition "under penalty of perjury," the Petition was filed with the Arizona Court.

97. Among other material facts, the Petition falsely stated that:

a. Mother and Father moved to Arizona to avoid Los Angeles social workers' intervention. This was not true. Totiyanna and Freddie moved to Arizona for Freddie's job. They had previously informed Los Angeles social workers of the prospective move, which occurred in February of 2017. Moreover, the California Court and Los Angeles social workers knew about Totiyanna's move to Arizona. There was no attempt to avoid or circumvent the Los Angeles social workers.

b. Mother is unwilling or unable to provide proper and effective parental care and control. This was not true. Indeed, both Butcher and Lemley-Spence

admitted K.M. was well nourished with no signs of maltreatment just one day before she seized K.M. without first getting a warrant or court order.

98. The above identified false statements and the suppressed exculpatory evidence are only examples. They do not constitute the full extent of Butcher's and Lemley-Spence's deception in the presentation of evidence to the Arizona Court in the Dependency Report.

99. Due to the intentional and despicable nature of the Defendants' misconduct, as described throughout, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of them, subject to proof at trial.

## THIRD CLAIM FOR RELIEF

**(Deprivation of Constitutional Rights – Non-Consensual and Unwarranted Forensic Medical Examination)**

**By PLAINTIFFS TOTIYANNA TURNER AND FREDDIE MADRIGAL**

**Against Defendants BUTCHER, LEMLEY-SPENCE, and DOES 1 through 50, inclusive**

100. Plaintiffs Totiyanna Turner and Freddie Madrigal incorporate the above allegations of fact and law as though fully set forth herein.

101. At all times relevant hereto, the constitutional right to remain free of non-consensual intrusive forensic medical examinations was "clearly established" such that any reasonable person in Defendants' circumstances would know that it is a violation of the parents' constitutional rights to subject their child to a forensic medical examination without just cause, parental consent, or a court order/warrant authorizing the examination. *See Swartwood v. County of San Diego*, 84 F. Supp. 3d 1093, 1116-1117 (S.D. Cal. 2014) ["[T]he Constitution assures parents, in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances."] Barring a reasonable concern that material physical evidence might dissipate, or that

some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. Cal. 2000).

102. Defendants Butcher and Lemley-Spence and DOES 1 - 50 Inclusive, ordered that K.M. endure a forensic medical examination. Neither of them sought or obtained a warrant or other similar court order authorizing K.M.'s invasive forensic medical evaluations prior to the examination being conducted. At no point in time did Defendants, or anyone else, ever seek or obtain consent from K.M.'s parents to conduct an invasive forensic medical examination.

103. Defendants, and each of them, including DOES 1- 50, subjected K.M. to invasive forensic medical examinations, including a genital examination, without the consent, knowledge, or presence of either Plaintiff. These examinations were performed at the request of Defendants. There was no reasonable basis to conduct a forensic medical examination on K.M.

104. As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

105. No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and ordering the unwarranted K.M.'s forensic medical examination was lawful under the circumstances. Thus, Defendants knew, or reasonably should have known their conduct was unlawful. Due to Defendants' knowing violation of Plaintiffs' rights, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of them, subject to proof at trial.

/ / /

/ / /

/ / /

**<u>FOURTH CLAIM FOR RELIEF</u>**

**(Deprivation of Constitutional Rights – Non-Consensual Unwarranted Medical Procedures - Vaccinations)**

**By PLAINTIFFS TOTIYANNA TURNER AND FREDDIE MADRIGAL**

**Against Defendants BUTCHER, LEMLEY-SPENCE, and DOES 1 through 50, inclusive**

106. Plaintiffs Totiyanna Turner and Freddie Madrigal incorporate the above allegations of fact and law as though fully set forth herein.

107. At all times relevant hereto, the constitutional right to remain free of non-consensual intrusive medical procedures was "clearly established" such that any reasonable person in Defendants' circumstances would know that it is a violation of the parents' constitutional rights to subject the child to multiple vaccinations without just cause, parental consent, or a court order/warrant authorizing the procedure. *See Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). Parents have a guaranteed constitutional right arising from the liberty interest in family association to be with their children while they are receiving medical attention or undergoing medical procedures. *Id.* at 1142. This constitutional right to familial association includes the right of parents to make important medical decisions for their children. *Id.* at 1141.

108. Defendants Butcher, Lemley-Spence, and DOES 1 - 50 inclusive, ordered K.M. to be vaccinated for multiple diseases. Yet, none of them sought or obtained a warrant or other similar court order authorizing K.M.'s vaccinations. Nor did Defendants, or anyone else, ever seek or obtain consent from Plaintiffs.

109. K.M. was healthy, exhibited no signs of abuse, showed no signs of any type of injury, had no medical problems, and was not in need of any medical attention.

110. Yet, without a warrant, court order authorizing the vaccinations, or parental consent, Defendants Butcher, Lemley-Spence, and DOES 1 - 50 inclusive, vaccinated K.M. for multiple diseases.

/ / /

111. No reasonable government agent in Defendants' position could have believed that their conduct, i.e., agreeing to and ordering multiple unwarranted vaccinations for a child was lawful.

112. As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

113. No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and ordering K.M.'s unwarranted and non-consensual vaccinations, was lawful under the circumstances. Thus, Defendants knew, or reasonably should have known their conduct was unlawful. Due to Defendants' knowing violation of Plaintiffs' rights, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of them, subject to proof at trial.

**JURY DEMAND**

Plaintiffs demand a jury trial as to all issues so triable.

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as to all causes of action, as follows:

1. General damages and special damages according to proof, but in no event less than $2,000,000;
2. As against the individual defendants, punitive damages as allowed by law;
3. Attorneys fees pursuant to 42 U.S.C. §1988, and any other appropriate statute;
4. Costs of suit incurred herein; and
5. Such further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

Dated: October 8, 2018

The Law Offices of Shawn A. McMillan, A.P.C.

/s/ Adrian M. Paris
Shawn A. McMillan, Esq.
Stephen D. Daner, Esq.
Adrian M. Paris, Esq.
Attorneys for Plaintiffs